# In the United States Court of Federal Claims

No. 12-047C

(Filed: May 11, 2012)

Reissued: May 25, 2012[1]

_____

| | |
|---|---|
| INTERNATIONAL GENOMICS CONSORTIUM,<br><br>                      Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>                      Defendant. | *<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>* | Preaward bid protest; Jurisdiction – 28 U.S.C. § 1491(b)(1); Interested party; Contractor could not challenge agency decision to shift management of agency program to third contractor under existing task order contract; *Distributed Solutions* distinguished; No bid protest jurisdiction to review agency decision not to exercise option; Management contractor was not agent of federal agency; Relief denied. |

_____

**OPINION**

_____

*Brett William Johnson,* Snell & Wilmer L.L.P., Phoenix, AZ, for plaintiff.

*Tara K. Hogan*, Civil Division, Commercial Litigation, United States Department of Justice, Washington, D.C., with whom was Acting Assistant Attorney General *Stuart F. Delery*, for defendant.

**ALLEGRA, Judge:**

       In this preaward bid protest case, International Genomics Consortium (IGC or plaintiff), challenges a decision by the National Cancer Institute (NCI) to assign Science Applications International Corporation-Frederick (SAIC-F) the responsibility for procuring certain services needed to run a NCI project.  The parties have filed cross-motions for judgment on the administrative record.  In support of its motion, the United States argues that this court lacks jurisdiction to consider IGC's challenges to NCI's delegation of services to SAIC-F and to

---

[1] An unredacted version of this opinion was issued under seal on May 11, 2012.  The parties were given an opportunity to propose redactions, but no such proposals were made.  Nonetheless, the court has incorporated some minor changes into this opinion.

SAIC-F's procurement of what are, in effect, subcontracted services.  For the reasons that follow, the court **GRANTS** defendant's cross-motion for judgment on the administrative record.[2]

I.  BACKGROUND

The administrative record in this case reveals the following:

Plaintiff is a non-profit medical research organization that currently is one of a half a dozen or more contractors performing services for NCI as part of The Cancer Genome Atlas project (Atlas).  Atlas is a large-scale collaborative effort by NCI and the National Institutes of Health to create a comprehensive collection of maps that chart the genomic changes that occur in various types of cancer.  As part of this effort, plaintiff supplies various services as a Biospecimen Core Resource (BCR).

BCRs serve as the central coordinating hubs for Atlas.  Under Atlas, so-called Tissue Source Sites obtain samples and conduct the preliminary pathology review.  Those sites deliver the tissue samples to the BCRs, which refine them into high-quality nucleic acids, and distribute these products downstream to Genome Sequencing Centers and Genome Characterization Centers.  Prior to accepting samples, the BCRs train the Tissue Source Sites on how to obtain high-quality samples and the proper procedures for handling and shipping these samples.  The BCRs also play a key role in helping to design and effectuate solutions for the capture of complete biospecimens and clinical data sets for these samples.  Finally, the BCRs are responsible for transmitting all these data sets to the Atlas Data Coordinating Center and Sequence Data Archives, which eventually make the data available to investigators.  The BCR function is not the only part of this process that NCI has contracted out.  For example, the Data Coordinating Center is managed by another contractor, SRA International, while the Sequence Data Archives are run by the University of California at Santa Cruz.  Still other contractors run other critical parts of the program and hundreds of private institutions act as Tissue Source Sites.

The Frederick National Lab of the National Cancer Institute (NCI-Frederick) is a government-owned, Federally-funded research and development center.  Such centers are privately-run facilities used to meet long-term governmental research or development needs.  *See* 48 C.F.R. § 35.017(a).  NCI-Frederick provides a unique national resource for the development of new technologies and the translation of scientific discoveries into novel agents for the prevention, diagnosis, and treatment of cancer and acquired immune deficiency syndrome (AIDS).  Since 2001, SAIC-F has operated NCI-Frederick under a contract with NCI.

Atlas began in 2006, as a pilot program run by SAIC-F.  In August 2006, following a competitive procurement, SAIC-F awarded the BCR contract for this pilot program to plaintiff.  Subsequently, in December 2009, SAIC-F awarded Nationwide Children's Hospital

---

[2] Owing to the urgent need of the parties for a ruling on this matter, the court's recitation of the facts and law is necessarily brief.

(Nationwide) a contract to serve as a second BCR facility for the pilot program.  Plaintiff and Nationwide were each funded to handle five hundred cases per month.

NCI's most recent contract with SAIC-F, effective September 26, 2008, calls for it to provide scientific and business leadership, shared research support services, program-dedicated research, and business execution and operational support activities.  The contract is designed to be flexible enough to permit SAIC-F to manage a wide range of new projects for NCI.  By way of illustration, the statement of work in this contract specifies that SAIC-F is to "be responsible for the management and conduct of a broad range of research, research support, and administrative support services in response to the requirements of NCI/NIH scientific directions and priorities."  It further requires that the "Contractor maintain[] flexibility and [be] rapidly responsive in supporting the evolving on-going research, emerging technologies, and new research initiatives of the Government."  SAIC-F is also to support research "encompass[ing] a wide range of scientific disciplines" and "be responsible for the comprehensive operation of the NCI-Frederick and other NCI/NIH facilities or programs."   The statement of work lastly provides that "[a]ll . . .   contract requirements are defined by the Government," adding that SAIC-F "shall be responsible for the establishment and management of new Government efforts requested by the [Government]."

One of the projects specifically mentioned in the statement of work is Atlas.  Thus, NCI's 2009 contract with SAIC-F provides:

> The Contractor shall provide support to the Cancer Genome Anatomy Project (CGAP) and other efforts including The Cancer Genome Atlas (TCGA) and Cancer Genetic Markers of Susceptibility (cGEMs) directed toward elucidating the molecular events in normal, pre-cancer and cancer cells.  The Contractor will assist in the identification of institutions having unique capabilities to conduct the analysis of the cellular genes and gene products, including DNA sequencing and the construction of expression libraries, and will access such institutions through its subcontracting program.  The Contractor shall also provide research support to these efforts through its Advanced Technology Program.

The contract contains a detailed subcontracting plan, as well as several other references to SAIC-F's ability to subcontract certain services.

In November 2009, with the pilot phase of Atlas set to conclude, defendant modified SAIC-F's contract to deobligate some funding for Atlas.  In 2010, defendant announced that the Atlas project would exit the pilot phase and become fully operational.  Rather than delegating that program back to SAIC-F, NCI initially chose to run Atlas itself.  In September 2010, defendant conducted a procurement for BCR services for the project.  Following a competition, defendant awarded contracts to plaintiff and to Nationwide, effective September 24, 2010, to continue performing BCR services for Atlas.  These contracts were managed directly by NCI.  Plaintiff's contract was originally set to expire in March 2012, with a series of options that could stretch the period of performance through 2016.

In March 2011, Dr. Kenna Shaw, a NCI employee, notified her supervisors that the BCR facilities were not being used to capacity, and recommended awarding the function to a single BCR facility. She opined that Nationwide was outperforming plaintiff and that, in the event of a consolidation, Nationwide should be the sole BCR facility. NCI officials discussed this idea, but came to no conclusion. In April of 2011, Dr. Shaw became Atlas' Deputy Director and the contracting officer's technical representative (COTR) on the BCR contracts.

In May 2011, NCI officials began to discuss a new proposal: consolidating portions of Atlas with portions of two other projects operated by SAIC-F that shared requirements with Atlas – the Cancer Human Biobank (caHUB) and Cancer Biomedical Informatics Grid (caBIG). The proposal envisioned placing under SAIC-F the management of the consolidated Atlas program, including supervision of all the contracts under that program (including plaintiff's). Dr. Shaw supported the proposal, noting that budgetary savings and efficiencies could be realized by reducing the overlap between the projects. Some NCI officials expressed doubt whether stimulus funding that had been appropriated for caHUB could be used for Atlas. On September 6, 2011, the Director of NCI's Office of Acquisitions concluded that caHUB funds could be used for Atlas and, based on that finding, approved the plan to combine components of Atlas with parts of caHUB and caBIG, all under SAIC-F's control. Around this time, Dr. Shaw prepared an informal task order to SAIC-F to authorize it to conduct the BCR procurement, encouraging it to consolidate the BCR function into a single facility via a competition limited to the two existing BCRs.

On September 16, 2011, NCI notified plaintiff that it would not be exercising the options on its contract. On October 25, 2011, Dr. Shaw ceased being the COTR for IGC's contract, although she remained the alternative COTR on that contract, as well as Atlas' Deputy Director. On October 26, 2011, NCI modified plaintiff's contract to extend the base period of performance to December 2012. On or about October 28, 2011, having been granted responsibility for Atlas, SAIC-F notified NCI that it intended to award the BCR services to Nationwide on a sole-source basis. On November 7, 2011, plaintiff filed an agency-level protest against defendant. On November 16, 2011, SAIC-F reversed course and opted to hold a full and open competition for the BCR services. On December 5, 2011, plaintiff filed a second agency level protest, alleging that SAIC-F was biased against it and that NCI's transfer of Atlas to SAIC-F was motivated by a desire to exclude plaintiff from the contract.[3] On January 12, 2012, a NCI contracting officer

---

[3] Among the evidence plaintiff cited in support of these claims were various emails sent by Dr. Shaw that it claimed showed her bias against IGC. The emails in question, however, appear only to document Dr. Shaw's lingering concerns regarding plaintiff's performance, particularly as compared to that of Nationwide. Contrary to plaintiff's claims, none of these emails suggest that Dr. Shaw transferred the entire revamped Atlas project to SAIC-F in order to exclude plaintiff from any further award of the BCR contract. In this court, plaintiff introduced the declaration of Dr. Joseph Vockley, who was Atlas' Director before he left NCI. In his declaration, Dr. Vockley indicated that Dr. Shaw disliked plaintiff and wanted to "get rid" of it and "make them pay." However, the remainder of his declaration suggests that if Dr. Shaw made these comments, they were based upon her perception of IGC's performance. Indeed, several paragraphs in this brief declaration note that Dr. Shaw's complaints involved IGC's

denied both protests for lack of jurisdiction, on the grounds that plaintiff was protesting a private procurement, *i.e.*, one being conducted by SAIC-F.

On January 24, 2012, plaintiff filed a complaint in this court seeking an injunction to prevent NCI from delegating procurement responsibility for BCR services to SAIC-F. On March 9, 2012, plaintiff filed a motion for judgment on the administrative record. On March 23, 2012, defendant filed a cross-motion for judgment on the administrative record. Defendant's cross-motion effectively moves to dismiss a large portion of plaintiff's case under RCFC 12(b)(1) for lack of jurisdiction. Briefing of these motions was completed on April 13, 2012 , and oral argument was held on April 20, 2012.[4]

## II.   DISCUSSION

Plaintiff must establish that the court has subject matter jurisdiction over its claims. *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988). Defendant argues that plaintiff has failed to demonstrate that this court has jurisdiction over several of its claims. Moreover, the court, as it is solemnly obliged to do, has raised other jurisdictional issues that it believes are lurking in plaintiff's complaint. *See Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506 (2006); *Rick's Mushroom Serv., Inc. v. United States*, 521 F.3d 1338, 1346 (Fed. Cir. 2008) ("any party may challenge, or the court may raise sua sponte, subject matter jurisdiction at any time).

This court has "jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). Interested parties are those "prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *Am. Fed'n of Gov't Emps. v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001), *cert. denied*, 534 U.S. 1113 (2002) (citing 31 U.S.C. § 3551(2)(A)); *see also Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006). In addition, "[t]he plaintiff in a bid protest must show that it has standing to bring the suit." *L–3 Global Commc'ns Solutions, Inc. v. United States*, 82 Fed. Cl. 604, 608 (2008) (citing *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003)).[5] "Because standing is jurisdictional," the Federal Circuit has stated, "lack of standing

---

failure to "take her direction on technical matters and scientific approach" and to "question whether some directions were consistent with the scope of the existing government contract." Dr. Vockley further averred that Dr. Shaw had said that she felt IGC was "incompetent."

[4]  NCI and SAIC-F have agreed that SAIC-F will not make an award under the BCR competition until a decision is reached by this court.

[5]  Although the Court of Federal Claims, an Article I court, "applies the same standing requirements enforced by other federal courts created under Article III," *Anderson v. United States*, 344 F.3d 1343, 1350 n. 1 (Fed. Cir. 2003), the Federal Circuit has determined that 28

precludes a ruling on the merits." *Media Techs. Licensing LLC v. Upper Deck Co.*, 334 F.3d 1366, 1370 (Fed. Cir. 2003).

"The pivotal element of standing in a bid protest is whether a protestor qualifies as an 'interested party' under [section] 1491(b)(1)." *Rhino Corps Ltd. Co. v. United States*, 87 Fed. Cl. 481, 485 (2009); *see also Boston Harbor Dev. Partners, LLC v. United States*, 2012 WL 936633, at *3 (Fed. Cl. Mar. 5, 2012). The Federal Circuit has construed the term "interested party" as synonymous with the term "interested party," as defined in the Competition in Contracting Act, 31 U.S.C. § 3551(2)(a). *See Am. Fed'n of Gov't Emps.*, 258 F.3d at 1302; *see also Avtel Servs. Inc. v. United States*, 501 F.3d 1259, 1261 (Fed. Cir. 2007). In order to have standing as an "interested party," a protester must satisfy a two-part test. First, the protester must demonstrate that it is an actual or prospective bidder. *Rex Serv. Corp.*, 448 F.3d at 1307; *see also MCI Telecomm. Corp. v. United States*, 878 F.2d 362, 365 (Fed. Cir. 1989) (noting that "one who has not actually submitted an offer must be expecting to submit an offer prior to the closing date of the solicitation"). Second, the protester must demonstrate that it has a direct economic interest in the procurement. *Rex Serv. Corp.*, 448 F.3d at 1307; *see also Distributed Solutions, Inc. v. United States*, 539 F.3d 1340, 1344 (Fed. Cir. 2008) (*Distributed Solutions II*).

Applying these standards, this court concludes that it lacks jurisdiction to consider many of plaintiff's claims. In many ways, plaintiff's jurisdictional case hinges on a fundamental mischaracterization of the facts. Thus, IGC seeks to leave the impression that it was singled out by NCI for ill-treatment – that the agency, faced with the choice of procuring the BCR services itself or having SAIC-F do that task, chose the latter option as a way to get rid of plaintiff. Now, Mark Twain once advised never to let the facts get in the way of a good story – but, here, the facts really do get in the way. Contrary to plaintiff's claims, the administrative record shows that NCI, primarily for budget and efficiency reasons, combined features of Atlas with features of two other programs, caHUB and caBIG, and then gave the management of the entire program to SAIC-F. This made sense because SAIC-F was already running the caHUB and caBIG programs and had run the pilot version of Atlas several years earlier. Under this delegation, SAIC-F was required to perform a wide range of management services with respect to all the components of the newly-restructured Atlas program – not just those that involved BCR services. In performing that multi-faceted function, SAIC-F dealt with more than a dozen contractors and hundreds of tissue providers – it was not just responsible for managing the BCR procurement that involved plaintiff.

Understanding all this proves important because the flaws in plaintiff's arguments are not fully revealed until viewed in their proper factual context. Properly viewed in that context, plaintiff was not, with respect to NCI's assignment of tasks to SAIC-F, an "interested party," as that term is used in section 1491(b)(1) of Title 28. Plaintiff has not demonstrated that it was an "actual or prospective bidder" on the management services that NCI assigned to SAIC-F under

---

U.S.C. § 1491(b) "imposes more stringent standing requirements than Article III." *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009).

its contract, for in no way was plaintiff qualified to run the entire revamped Atlas program. Indeed, to this day, IGC has never expressed a desire to bid on anything other than the performance of the BCR services.  For similar reasons, plaintiff also does not possess the requisite direct economic interest needed to confer standing.  "To prove a direct economic interest as a putative prospective bidder," the Federal Circuit has stated, a protester "is required to establish that it had a 'substantial chance' of receiving the contract." *Rex Services*, 448 F.3d at 1308; *see also Digitalis Educ. Solutions, Inc. v. United States*, 664 F.3d 1380, 1384 (Fed. Cir. 2012); *Myers Investigative & Security Servs., Inc. v. United States*, 275 F.3d 1366, 1370 (Fed. Cir. 2002).  Because IGC could not have bid on a contract to manage the combined Atlas/caHUB/caBIG program, it would have had no chance of securing that contract, and, for that reason too, is not an "interested party."  That plaintiff might fail to receive the new BCR award under the pending SAIC-F procurement and thus end up a "disappointed subcontractor" does not confer upon it the standing that it otherwise conspicuously lacks.  *See Blue Water Envtl., Inc. v. United States*, 60 Fed. Cl. 48 (2004).

In arguing to the contrary, plaintiff heavily relies upon the Federal Circuit's opinion in *Distributed Solutions II*.  In that case, the United States Agency for International Development (USAID) issued a task order to a contractor for information technology support and technical services.  *Distributed Solutions, Inc. v. United States*, 76 Fed. Cl. 524, 525 (2007) (*Distributed Solutions I*).  USAID, in conjunction with its contractor, SRA International (SRA), developed and issued a Request for Information (the June RFI) that solicited vendor responses regarding the availability of certain commercial off-the-shelf software.  *Id*.  While the June RFI warned that it would "not result in a contract award," the document, nonetheless, required vendors to provide detailed product descriptions and demonstrate how their products worked.  *Id*.  Companies responding to the RFI were required to make three-hour presentations to the agency.  *Id*.  After receiving the responses to the RFI and seeing these presentations, USAID developed a formal Acquisition Strategy and a Source Selection Plan, under which it decided to assign to SRA the task of procuring the needed software.  *See Distributed Solutions, Inc. v. United States*, 2012 WL 1570997, at *2-3 (Fed. Cl. Apr. 13, 2012) (*Distributed Solutions III*).[6]  Subsequently, USAID publicly announced that "[b]ased on the results of the reviews and demos, the Government has decided to pursue alternative courses of action." *Distributed Solutions I*, 76 Fed. Cl. at 525.  It thereupon issued SRA a task order requiring the contractor to obtain the off-the-shelf products necessary to meet the agency's needs.  *Id*. at 526.  SRA issued a second RFI seeking vendors to provide the products and, with approval from USAID, awarded subcontracts to selected vendors without competition.  *Id*.  Distributed Solutions, which had responded to both RFIs, did not receive one of these subcontracts.  *Id*.  Together with other losing bidders, it filed suit in this court, challenging the USAID's decision to give SRA the task of awarding subcontracts for the software, rather than procuring the software itself.  *Id*. at 527  This court held that it lacked jurisdiction to consider this claim.  *Id*. at 528.

Reversing that decision, the Federal Circuit held that the protesters were "interested parties" within the meaning of section 1491(b)(1).  *Distributed Solutions II*, 539 F.3d at 1346.

---

[6] These facts, though not cited in the earlier opinions, are cited in the remand opinion.

The court emphasized initially that the protestors were "not contesting [the task-order contractor's] award of the subcontracts," but rather "the government's decision to task [that contractor] with awarding subcontracts . . . instead of procuring the software itself through a direct competitive process." *Id*. at 1344. Because of this, the Federal Circuit found that the case came within this court's bid protest jurisdiction, reasoning:

> There is no question that the contractors here are interested parties and not mere "disappointed subcontractors" without standing. To qualify as an "interested party," a protestor must establish that: (1) it was an actual or prospective bidder or offeror, and (2) it had a direct economic interest in the procurement or proposed procurement. . . . Assuming that the [Government's] RFI was part of the challenged procurement process, the contractors have established themselves as prospective bidders in that they submitted qualifying proposals in response and, according to their complaint, were prepared to submit bids pursuant to the anticipated Request for Quotation (RFQ) or Request for Proposal (RFP) that typically ensues after an RFI is issued . . . . The contractors also possess a direct economic interest in the government action at issue in that they were both deprived of the opportunity to compete for the provision of acquisition and assistance solutions for [the Government program].

*Id*. at 1344-45. In holding that the protesters had standing, the court distinguished cases holding that "adding work to an existing contract that is clearly within the scope of the contract does not raise a viable protest under § 1491(b)(1)." *Id*. at 1346 (citing *AT & T Commc'ns, Inc. v. Wiltel, Inc.*, 1 F.3d 1201 (Fed. Cir. 1993)). "The government did not merely add work to an existing contract in this case," the Federal Circuit explained, but "issued the June RFI which stated that, 'The primary objective of this effort is to select and implement acquisition and assistant solutions that meet the unique functional requirements'" of the agency. 539 F.3d at 1346.[7] Completing its analysis, the court opined that "unlike *AT&T*, the government used an RFI to solicit information from outside vendors, and then used this information to determine the scope of services required by the government." *Id*. The issuance by the agency of the RFI thus marked the beginning of "the process for determining a need for property or services," creating a "proposed procurement" over which this court had jurisdiction. *Id*.

Plaintiff reads *Distributed Solutions II* as extending this court's jurisdiction to any situation in which a putative protester discovers that an agency internally considered whether to

---

[7] Of course, *AT & T* is distinguishable for a reason not mentioned by the Federal Circuit: it was decided on the merits. *AT & T*, 1 F.3d at 1203; *see also RN Expertise, Inc. v. United States*, 97 Fed. Cl. 460, 474-76 (2011); *cf. Ceradyne, Inc. v. United States*, 103 Fed. Cl. 1, 12 (2012). Subsequent decisions have elided the distinction between jurisdiction and merits, on the grounds that a modification within the scope of the contract does not involve a procurement and, therefore, does not trigger jurisdiction under section 1491(b)(1). *See, e.g.*, *RhinoCorps Ltd. Co. v. United States*, 87 Fed. Cl. 481, 487-89 (2009); *CCL, Inc. v. United States*, 39 Fed. Cl. 780, 788 (1997).

fulfill a requirement by adding work to an existing contract or, instead, by procuring the good or service directly. As plaintiff sees it, the agency's discussions that precede such a decision, no matter how laconic or informal, begin the "process for determining a need for property or services," thereby giving rise to a "proposed procurement," the existence of which, in turn, triggers this court's jurisdiction. Endorsing this view would effectuate a broad expansion of this court's bid protest jurisdiction. One need only look at the case *sub judice* to see why: To the extent this case focuses on NCI's decision to shift management of the expanded Atlas program to SAIC-F, any of the more than a half a dozen contractors that originally worked for NCI under Atlas seemingly could, like plaintiff, protest that decision if they felt that their economic interests were threatened. If adopted, plaintiff's theory would also allow any contractor who might have bid on a procurement run by NCI to challenge the agency's decision to assign the task of conducting that procurement to SAIC-F – even if that procurement involved only a small and distinct part of the expanded Atlas program. And, why stop there? Carried to its logical end, plaintiff's reading of *Distributed Solutions II* would also authorize this court to review any challenge to an agency's needs determination – no matter how nascent, informal, or abbreviated the process was leading up to that decision – so long as that "process" resulted in a determination to forego the use of an outside contractor.

Perhaps a bit uncomfortable with the breadth of its reading of *Distributed Solutions II*, plaintiff argues that this court can confine its holding to the facts here. But, the broad implications of plaintiff's arguments are not so easily constrained. *Per contra*. Adopting plaintiff's reading of *Distributed Solutions II* would unlock a veritable Pandora's box of bid protest challenges to many internal agency decisions that never ripen into government procurements – decisions that heretofore have been viewed as off-limits to judicial review. If plaintiff is right, an agency decision to use a prime contractor to manage a project could be challenged by subcontractors that feel economically threatened by the new arrangement and that prefer to maintain direct privity with the United States;[8] decisions not to exercise options would be protestable, not because of the decisions themselves, but because of the needs assessment that

---

[8] *Compare US West Commc'ns Servs., Inc. v. United States*, 940 F.2d 622, 627 (Fed. Cir. 1991) (procurement by non-government corporation was not protestable under Brooks Act); *MCI Telecomm. Corp. v. United States*, 878 F.2d 362, 365 (Fed. Cir. 1989) (applying Brooks Act definition of "interested party" and holding that an offeror who "deliberately chose to be only a subcontractor and not to submit its own proposal" could not achieve "prospective bidderhood"); *Terry v. United States*, 96 Fed. Cl. 131, 143-44 (2010), *vacated in part*, *on other grounds*, 98 Fed. Cl. 736 (2011) (subcontractor does not have standing to challenge procurement); *Klinge Corp. v. United States*, 87 Fed. Cl. 473, 478 (2009) (potential subcontractor does not have standing to challenge the validity of RFQ); *Eagle Design & Mgmt., Inc. v. United States*, 62 Fed. Cl. 106, 108 (2004) (protestor "as a subcontractor to an offeror in this procurement is not itself an actual or prospective offeror, and thus not an interested party"); *Blue Water Env. v. United States*, 60 Fed. Cl. 48, 51-52 (2004) (procurement conducted by private contractor which operated laboratory under management contract with Department of Energy not covered by court's bid protest jurisdiction); *but see CHE Consulting, Inc. v. United States*, 71 Fed. Cl. 634, 635 (2006) (subcontractor could intervene in bid protest action).

necessarily preceded them;[9] and, indeed, every agency decision not to procure a product or service would be subject to protest by any company that, if the agency had decided to conduct a procurement, might have obtained the resulting contract.[10] If plaintiff is right, all the precedents cited in the margins are either wrong or easily circumvented. Indeed, with a little lawyerly creativity – never in short supply – all of the situations described, and more, could readily be brought within plaintiff's sweeping interpretation of *Distributed Solutions II*. Disappointed bidders could then conduct "fishing expeditions" into the otherwise confidential documents of an agency in hopes of revealing some previously-undisclosed internal deliberations that might provide grounds for a protest. *Compare Micro Motions, Inc. v. Kane Steel Co., Inc.*, 894 F.2d 1318, 1327 (Fed. Cir. 1990) (discovery is "designed to assist a party to prove a claim it reasonably believes to be viable ***without discovery***, not to find out if it has any basis for a claim" (emphasis in original)).

Only one thing stands between plaintiff's theory and this parade of problems: plaintiff's interpretation of *Distributed Solutions II* appears to go beyond what the Federal Circuit actually held. A careful reading of the circuit's decision reveals that the court repeatedly relied upon the fact that the agency had begun a formal contracting process by issuing an RFI. *See* 539 F.3d at 1344-45 ("[a]ssuming that the June RFI was part of the challenged procurement process, the contractors have established themselves as prospective bidders . . ."); *id*. at 1346 (noting that the

---

[9] *Compare Jones Automation, Inc. v. United States*, 92 Fed. Cl. 368, 371-72 (2010) (agency's decision not to exercise an option is not a "procurement decision" within the meaning of bid protest jurisdiction); *Gov't Tech. Servs., LLC v. United States*, 90 Fed. Cl. 522, 527-28 (2009) (court has no bid protest jurisdiction over agency's decision not to exercise option); *Am. Consulting Servs., Inc*., 97-2 C.P.D. ¶ 37 (1997) ("To the extent ACS challenges the agency's refusal to exercise the final option of its FAST contract, this issue is not for our review since a contracting agency's decision whether to exercise an option is a matter of contract administration outside the scope of our bid protest function."); *see also K-Lak Corp. v. United States*, 98 Fed. Cl. 1, 6 n.10 (2011); *but see Magnus Opus Techs., Inc. v. United States*, 94 Fed. Cl. 512, 526 n.7 (2010). For similar rulings involving efforts to enjoin the termination of a contract, *see Data Monitor Sys., Inc. v. United States*, 74 Fed. Cl. 66, 71-72 (2006) (holding that this court lacked jurisdiction to enjoin a contracting agency's termination of a contract); *Griffy's Landscape Maintenance LLC v. United States*, 51 Fed. Cl. 667, 672-73 (2001) (holding that the awardee of a contract may not challenge the decision to terminate that contract by invoking the court's bid protest jurisdiction); *Davis/HRGM Joint Venture v. United States*, 50 Fed. Cl. 539, 544 (2001) (ruling that a contractor's challenge to a termination for convenience "does not fall within the express language of [28 U.S.C.] § 1491(b) because it does not relate to an interested party's objection to a solicitation, a proposed award, or an award").

[10] *Compare Hallmark-Phoenix 3, LLC v. United States*, 99 Fed. Cl. 65, 68 (2011) (court has no jurisdiction over protest of agency's decision to in-source project); *K-Mar Indus., Inc. v. U.S. Dept. of Defense*, 752 F. Supp. 2d 1207, 1212-13 (W.D. Okla. 2010) (insourcing decision was not a procurement within the meaning of 41 U.S.C. § 403(2) (now 41 U.S.C. § 111)); *see also Am. Fed'n of Gov't Emp.*, 258 F.3d at 1302; *but see Santa Barbara Applied Research, Inc. v. United States*, 98 Fed. Cl. 536, 542-43 (2011).

protesters had contended that "the June RFI represented 'the beginning of the process for determining the type of software to be acquired'"); *id*. ("[h]ere, unlike *AT & T*, the government used an RFI to solicit information from outside vendors"). Judge Merow, who recently decided the remand in *Distributed Solutions III*, likewise emphasized the importance of the formal steps taken by the USAID in deciding whether to procure the software in question – not only the use of the RFI, but also the development of a formal Acquisition Strategy and a Source Selection Plan. *Distributed Solutions III*, 2012 WL 1570997, at *2-3. References like these suggest that it was the issuance of the RFI to outside contractors (and perhaps the other formal, public procurement steps taken by USAID), and not the preceding internal agency discussions, which truly marked the beginning of the process to determine the agency's needs.[11] In the court's view, this distinction is key as it serves to delimit what would otherwise be a virtually all-embracing concept of what constitutes a "proposed procurement" within the meaning of section 1491(b)(1). Properly viewed, then, *Distributed Solutions II* is distinguishable from this case because here there was no RFI or other formal contracting action signifying the beginning of a procurement process. *See Gov't Tech. Servs.*, 90 Fed. Cl. at 527-28 (distinguishing *Distributed Solutions II* on this basis).[12]

Moreover, it should not be overlooked that in *Distributed Solutions II*, USAID tasked SRA with the job of conducting a particular procurement on which the protesters could have bid had the agency conducted that procurement itself. The situation here is fundamentally different. SAIC-F was not assigned the task of conducting a procurement for BCR services that NCI might have otherwise conducted itself. Rather, NCI assigned SAIC-F the broad task of managing a large governmental program, that combined significant features from three prior programs: Atlas, caHUB and caBIG. Broad management responsibilities, multiple contractors and budget authority that dwarfed the size of the BCR contract were all implicated by that decision. IGC could not have submitted a qualifying proposal to do the work that SAIC-F was assigned and thus, unlike the protesters in *Distributed Solutions*, has not "established [itself] as [a] prospective bidder." *Distributed Solutions II*, 539 F.3d at 1344-45; *see also Alatech Healthcare,* 89 Fed. Cl. at 753 (*Distributed Solutions II* applied where "agency developed plans and specifications for the subcontractor to carry out in a field very similar to the functions allocated by the agency to the prime."). In this way, plaintiff plainly stands outside the jurisdictional umbrella created by

---

[11] *See also Bona Fide Conglomerate, Inc. v. United States*, 96 Fed. Cl. 233, 239-40 (2010) (applying *Distributed Solutions II*; procurement began with decision by Presidentially-appointed committee to place service on procurement list mandated by 41 U.S.C. § 47(a)(1)); *Angelica Textile Servs., Inc. v. United States*, 95 Fed. Cl. 208, 215 (2010) (same); *Alatech Healthcare, LLC v. United States*, 89 Fed. Cl. 750, 753 (2009) (agency actions in planning, setting up and defining the procurement process for prime contractor and keeping agency official on prime contractor's selection committee were indicia of existence of procurement).

[12] *See also* Ralph C. Nash, 23 No. 4 Nash & Cibinic Rep. ¶ 16 (2009) ("[I]t is not clear in *Distributed Solutions* [*II*] whether the court would have had jurisdiction if the agency had not issued the original RFI, but rather had given the task to the task order contractor at the outset of the acquisition planning process."); *see generally*, *Phoenix Air Grp., Inc. v. United States*, 46 Fed. Cl. 90, 102 (2000).

*Distributed Solutions*, no matter how broadly that case is otherwise construed. *See Klinge Corp.*, 87 Fed. Cl. at 478 (distinguishing *Distributed Solutions II* on this basis). Accordingly, the court concludes that it lacks jurisdiction over plaintiff's claims challenging NCI's decision to shift management of the retooled Atlas program to SAIC-F.[13]

But, what of plaintiff's other claims? Plainly, this court also lacks jurisdiction to consider any challenge to NCI's decision not to exercise the options under plaintiff's existing contract. Such a decision, to the extent it is reviewable at all, gives rise to a dispute that must be brought under the Contract Disputes Act (CDA), 41 U.S.C. §§ 7101-09. *See Alliant Techsys., Inc. v. United States*, 178 F.3d 1260, 1264-65 (Fed. Cir. 1999); *Cessna Aircraft Co. v. Dalton*, 126 F.3d 1442, 1445-47 (Fed. Cir. 1997), *cert. denied*, 525 U.S. 818 (1998); *see also Jones Automation*, 92 Fed. Cl. at 371-72; *Gov't Tech. Servs.*, 90 Fed. Cl. at 526-28. To this court's knowledge, plaintiff has not met the procedural requirements that must be exhausted before bringing a CDA case – that is, it has not filed a written claim with the contracting officer and receive a final decision (or deemed decision) thereon. *See England v. The Swanson Group, Inc.*, 353 F.3d 1375, 1379 (Fed. Cir. 2004); *Sharman Co. v. United State*, 2 F.3d 1564, 1569 & n.6 (1993), *overruled on other grounds*, *Reflectone, Inc. v. Dalton*, 60 F.3d 1572 (Fed. Cir. 1995).[14] Accordingly, this claim also is not properly before the court.

This court has jurisdiction to consider plaintiff's claim that SAIC-F is violating Federal procurement rules in conducting the BCR procurement as NCI's agent. *See Blue Water*, 60 Fed. Cl. at 54. In a variety of cases, a subcontract procurement has been attributed to the government where an agency relationship between the government and the prime contractor is established by the terms of the prime contract. *See United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1551 (Fed. Cir. 1983); *Central Freight Lines, Inc. v. United States*, 87 Fed. Cl. 104, 109-10 (2009); *see also United States v. New Mexico*, 455 U.S. 720 (1982). "If the prime contractor is

---

[13] It is worth noting that plaintiff's merit arguments on this point are weaker than its jurisdictional claims. The court has little doubt, for example, that the management of the new Atlas program was within the scope of the broad contract that SAIC-F currently has with NCI. *See AT & T*, 1 F.3d 1205. Nor has plaintiff provided any "hard facts" to back up its claim that assigning this task to SAIC-F somehow violated the FAR's rules regarding actual or potential organizational conflicts of interest. *See Turner Constr. Co., Inc. v. United States*, 645 F.3d 1377, 1387 (Fed. Cir. 2011). Indeed, plaintiff's claims are so lacking in detail as to make it difficult to discern even what type of conflict it is alleging. *See PAI Corp. v. United States*, 614 F.3d 1347, 1353-54 (Fed. Cir. 2010) ("The mere existence of a prior or current contractual relationship between a contracting agency and a firm does not create an unfair competitive advantage, and an agency is not required to compensate for every competitive advantage gleaned by . . . prior performance of a particular requirement . . . " (quoting *ARINC Eng'g Servs. v. United States*, 77 Fed. Cl. 196, 203 (2007)); *see also NetStar-1 Gov't Consulting, Inc. v. United States*, 101 Fed. Cl. 511, 521-25 (2011) (discussing the relevant FAR provisions in detail).

[14] And these requirements hold true even if, as plaintiff maintains, the decision it seeks to challenge stemmed from bad faith. *See Gov. Tech. Servs.*, 90 Fed. Cl. at 526; *Cont'l Collection & Disposal, Inc. v. United States*, 29 Fed. Cl. 644, 648, 651 (1993).

acting as the government's agent when it enters into the subcontractor agreement," the Federal Circuit has stated, "the subcontractor may be permitted to sue the government directly." *Winter v. FloorPro, Inc.*, 570 F.3d 1367, 1371 n.3 (Fed. Cir. 2009). But, besides some *ipse dixit* assertions, plaintiff has not shown that SAIC-F is acting as NCI's agent in conducting the BCR procurement. While plaintiff claims that NCI has expressed its views about the past performance of the two contractors which are competing for the BCR contract, that is not enough to cause this court to conclude that NCI is, in fact, controlling the procurement in question.[15] Moreover, even if it were enough, plaintiff has failed to explain why the competitive procurement currently being conducted by SAIC-F violates any Federal statutes or regulations, or is otherwise arbitrary, capricious or contrary to law. The only claim that it makes in this regard – that the agency and SAIC-F are proceeding in bad faith – is not supported by the record and runs counter to the presumption that the government acts in good faith. *See Holmes v. United States*, 657 F.3d 1303, 1319 (Fed. Cir. 2011). The court is particularly disinclined to abandon the latter presumption before the procurement of the BCR services has even been completed. *See Boston Harbor Dev. Partners, LLC*, 2012 WL 936633, at *4 ("Absent countervailing indications, this presumption ought to be at its zenith where the government has yet to act.").

### III.   CONCLUSION

This court need go no farther. Based on the foregoing, the court **GRANTS** defendant's cross-motion for judgment on the administrative record, and **DENIES** plaintiff's motion for judgment on the administrative record.[16] Plaintiff is not entitled to the relief requested. The Clerk is hereby ordered to dismiss plaintiff's complaint.

**IT IS SO ORDERED**.

s/ Francis M. Allegra<br>
Francis M. Allegra<br>
Judge

---

[15] The Federal Circuit has held that, for a court to have jurisdiction under the agency theory: "(1) a prime contractor must act as a purchasing agent for the government, (2) the agency relationship between the government and the prime contractor must be established by clear contractual consent, and (3) the contract must state that the government is directly liable for the purchase price." *U.S. West Communic'ns Servs.*, 940 F.2d at 629; *see also Johnson Controls*, 713 F.2d at 1550. Plaintiff has failed to show that any of these requirements are met here – indeed, it offers no evidence whatsoever on the latter two requirements. *See Nat'l Leased Housing Ass'n v. United States*, 32 Fed. Cl. 454, 460 (1994) (indicating that the presence of these requirements is not to be presumed).

[16] The court intends to unseal and publish this opinion after May 24, 2012. On or before May 24, 2012, each party shall file proposed redactions to this opinion, with specific reasons therefor. *See CRAssociates, Inc. v. United States*, 102 Fed. Cl. 698, 698 n.1 (2011) (discussing the proper scope of such redactions).